# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CC-01315-COA

**GULF COAST TRANSIT SERVICES, LLC**                      **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF**                                  **APPELLEE**
**EMPLOYMENT SECURITY**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/2020 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | DONALD C. DORNAN JR. STEPHANIE GEE BEAVER |
| ATTORNEY FOR APPELLEE: | ALBERT B. WHITE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 01/11/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.    Gulf Coast Transit Services LLC (GCTS) appeals from the judgment of the Hinds County Circuit Court, which affirmed the determination that an employer-employee relationship existed between GCTS and Frederick Dawkins.

¶2.    In 2011, Dawkins signed an agreement to work for GCTS as an independent contractor. After Dawkins terminated the agreement in 2013, he filed a claim for unemployment benefits. When the Mississippi Department of Employment Security (MDES) found that no wages had been recorded, an investigation was conducted. At the conclusion of the investigation, MDES determined that Dawkins constituted an employee of GCTS.

GCTS appealed this decision and requested review by the administrative law judge (ALJ), who affirmed the determination of MDES. On appeal, the Mississippi Department of Employment Security Board of Review (the Board) affirmed the ALJ's decision. Then the circuit court affirmed the Board's decision.

¶3. On appeal before this Court, GCTS claims that the Board's decision was not supported by substantial evidence and was arbitrary and capricious. After review, we reverse the determination that Dawkins constituted an employee of GCTS, and we render a judgment finding that Dawkins's employment status constituted that of an independent contractor.

## FACTS AND PROCEDURAL HISTORY

¶4. In November 2013, Dawkins terminated his independent-contractor agreement with GCTS, a company that leased taxicabs to individuals who provided transportation services for hire in Harrison, Jackson, and Hancock Counties. He subsequently filed a claim for unemployment benefits. When MDES found no wages recorded for Dawkins, an investigation was conducted. As part of the investigation, GCTS and Dawkins were interviewed by Greg Boggan, a tax field representative for MDES, and they completed questionnaires. Additionally, GCTS provided MDES with a copy of the "Independent Contractor Agreement" between GCTS and Dawkins. After concluding the investigation, MDES determined that an employer-employee relationship existed between GCTS and Dawkins. Subsequently, GCTS appealed to the ALJ.

¶5. In March 2014, the ALJ conducted a telephonic hearing. During the hearing, the ALJ heard testimony from Eldridge Rose and Greg Boggan, representatives for MDES; Dawkins;

2

and Ellis Houston, the managing partner for GCTS. In May 2014, the ALJ affirmed the determination of MDES and held that "[GCTS] is an employer and is required to register with the [MDES] and pay Unemployment Insurance [T]ax on [Dawkins] and any and all similarly situated employees." GCTS appealed again.

¶6. In September 2016, the Board adopted the "Findings of Fact and Opinion" of the ALJ and affirmed the ALJ's decision. GCTS then appealed to the Hinds County Circuit Court, which affirmed the Board's decision. This appeal followed.

## STANDARD OF REVIEW

¶7. "When reviewing the circuit court's judgment to affirm or deny the Board's decision, this Court employs the abuse-of-discretion standard." *Magee v. Miss. Dep't of Emp. Sec.*, 77 So. 3d 1159, 1162 (¶5) (Miss. Ct. App. 2012) (citing *Miss. Dep't of Emp. Sec. v. Clark*, 13 So. 3d 866, 870 (¶8) (Miss. Ct. App. 2009)). "An agency's conclusions must remain undisturbed unless the agency's order: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond the scope or power granted to the agency, or (4) violates a statutory or constitutional right of the complaining party." *Dailey v. Miss. Dep't of Emp. Sec.*, 271 So. 3d 715, 717 (¶8) (Miss. Ct. App. 2018) (quoting *Miss. Dep't of Emp. Sec. v. Good Samaritan Pers. Servs. Inc.*, 996 So. 2d 809, 812 (¶6) (Miss. Ct. App. 2008)).

## DISCUSSION

¶8. GCTS claims that the decisions of the Board and circuit court affirming the ALJ's decision were arbitrary and capricious and not supported by substantial evidence. For efficiency, we will combine the analysis of these two issues.

3

¶9.   This Court and our supreme court have defined "arbitrary as 'not done according to reason or judgment, but depending on the will alone.'" *Magee*, 77 So. 3d at 1163 (¶7) (quoting *Wright v. Pub. Emps. Ret. Sys.*, 24 So. 3d 382, 388 (¶29) (Miss. Ct. App. 2009)). In addition, "capricious means 'done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.'" *Id*. "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." *Id*.

¶10.   The requirements to establish an employer-employee relationship are explained in section 71-5-11(I)(14) (Supp. 2012) of the Mississippi Code Annotated:

> Services performed by an individual for wages shall be deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the department that such individual has been and will continue to be free from control and direction over the performance of such services both under his contract of service and in fact; and the relationship of employer and employee shall be determined in accordance with the principles of the common law governing the relation of master and servant.

¶11.   This Court has recognized that "section 71-5-11(I)(14) directs us to employ common-law principles of master and servant, and the common law provides a flexible test." *Meds Inc. v. Miss. Dep't of Emp. Sec.*, 130 So. 3d 148, 151 (¶11) (Miss. Ct. App. 2014) (quoting *College Network v. Miss. Dep't of Emp. Sec.*, 114 So. 3d 740, 744 (¶14) (Miss. Ct. App. 2013)).  Our supreme court has provided factors to consider when determining whether an employee-employer or independent-contractor relationship exists:

> (1) The extent of control exercised over the details of the work;

> (2) Whether or not the one employed is engaged in a distinct occupation or business;

4

(3) The skill required in the particular occupation;

(4) Whether the employer supplies the tools and place of work for the person doing the work;

(5) The length of time for which the person is employed;

(6) The method of payment, whether by the time or by the job; and

(7) Whether or not the work is a part of the regular business of the employer.

*Id*. (quoting *Miss. Emp. Sec. Comm'n v. PDN Inc*., 586 So. 2d 838, 841-42 (Miss. 1991)).

¶12.    "A 'central issue' to consider when determining whether an individual is an employee or an independent contractor is 'whether the employer has the right to exercise control over the work of the employee.'" *Id*. at 152 (¶12) (quoting *Estate of Dulaney v. Miss. Emp. Sec. Comm'n*, 805 So. 2d 643, 646 (¶13) (Miss. Ct. App. 2002)).    "Stated differently, the relationship status depends upon the extent the putative employer controls, in substance and in detail, the work activities of the putative employee." *Id*. (quoting *College Network*, 114 So. 3d at 745 (¶14)).    "We consider the test for employee status based on the law applied to the facts of each case." *Id*.    "Additionally, we evaluate the physical acts of the work performed in light of the employer's right of control to determine the employment relationship." *Id*.

¶13.    An "Independent Contractor Agreement" existed between the parties. The Agreement stated, in relevant part:

> CONTRACTOR enters into this AGREEMENT for the purpose of operating THE TAXICAB as an **INDEPENDENT CONTRACTOR** (as defined herein)
> . . . .

(Emphasis added).  The Agreement further stated:

5

IT IS THE INTENTION OF THE PARTIES THAT THIS AGREEMENT ESTABLISHES CONTRACTOR AS **AN INDEPENDENT CONTRACTOR** OF GCTS . . . .

(Emphasis added).

¶14. The Agreement defined "Independent Contractor" as

a person who, in pursuit of an independent business, undertakes to do specific work for another person, using his own means and methods **without submitting himself to the control** of such other person with respect to the details of the work and who represents the will of such other person only as to the result of his work and not as to the means by which it is accomplished. Regardless of the standard utilized by a Court to define "Independent contractor" it is the intent of CONTRACTOR and GCTS that this AGREEMENT be interpreted in a manner to conform to the independent contractor relationship . . . .

(Emphasis added). Additionally, the record shows that Dawkins received tax forms W-9 and 1099k, which reflect his status as an independent contractor.

¶15. This Court has acknowledged that "the mere fact that a contract declares a worker to be an independent contractor 'is not conclusive as to whether the worker is an employee.'" *Id*. at 152 (¶15) (quoting *Senior Partners Inc. v. Miss. Emp. Sec. Comm'n*, 959 So. 2d 44, 49 (¶14) (Miss. Ct. App. 2006)). "Both the contract of service and the facts of operation thereunder must be considered in determining the relationship." *Id*. at 152-53 (¶15) (quoting *Mozingo v. Miss. Emp. Sec. Comm'n*, 224 Miss. 375, 384-85, 80 So. 2d 75, 79 (1955)). "In so doing, courts consider the actual practice of the parties, which supplements their written contract." *Id*. at 153 (¶15). Therefore, we turn to examine the actual practice of the parties.

¶16. In November 2011, Dawkins signed the one-year Agreement with GCTS. The Agreement automatically renewed in one-year terms until Dawkins terminated the agreement

6

in November 2013. Dawkins leased a taxicab from GCTS, which included a dispatch system, a global positioning system (GPS), a meter, a credit card machine, and a camera for $450 per week, and he provided transportation services to the public under the company's name. At the time, GCTS was doing business as "Yellow Cab" and was regulated by the Harrison County Motor Vehicle for Hire Commission (the Commission).

¶17. The Commission regulated the entrance of individuals as drivers and issued permits to them to operate taxicabs. In order to receive a permit, Dawkins was required to successfully complete a background check, a physical examination, and a drug test. Additionally, the Commission regulated the base rates for all fares. And the Commission required that all drivers agree not to drive for any other company.

¶18. GCTS was responsible for the color scheme of the taxicabs and advertising. Specifically, GCTS could design the taxicabs' appearance in compliance with the Commission's regulations, and GCTS had the right to retain revenue from any advertising affixed to the vehicles. GCTS was also responsible for the maintenance of the taxicabs and maintaining liability insurance.[1]

¶19. Although the Commission required some level of drug testing, according to the Agreement, drivers "may be tested on a random, volunteer, post-accident [basis], or if GCTS has a reasonable basis to believe that [the driver] is operating the taxicab while under the influence of alcohol or controlled substances." Additionally, while the Commission required Dawkins to dress appropriately, GCTS further required Dawkins to keep his vehicle clean

---

[1] Dawkins was responsible for fuel costs.

and conduct himself in a manner that would not damage the company's goodwill in the community (e.g., he could not act in a manner that was threatening, abusive, harassing, or sexually offensive toward customers). Dawkins also could not hire an unauthorized driver to work for him.

¶20. Dawkins was not supervised on a day-to-day basis. He was not required to work certain hours, nor was he required to accept a certain number of customers. GCTS did not pay Dawkins a salary or hourly fee. Instead, Dawkins was compensated through his customers by cash, credit card, or vouchers.[2] Dawkins was not required to give a percentage of his fares to GCTS, and he did not report his income to GCTS. At the hearing before the ALJ, GCTS testified, "We're not concerned with how [much] money [the drivers] make." Instead, GCTS was concerned with collecting the drivers' lease payments. Although not required, Dawkins elected to pay his lease with any credit card payments first, and then GCTS would give him the remaining balance.

¶21. While the use of GCTS's dispatch service was optional, it was the most successful way to obtain customers. If Dawkins elected to use the service, he could accept or refuse dispatches. However, if he accepted a dispatch, he could only accept one at a time and was required to complete the fare. Dawkins was not allowed to accept dispatches from another company, but he was permitted to solicit fares with business cards and accept "walk-ins" and

_____

[2] GCTS had agreements with entities such as airports, hospitals, and casinos to provide transportation services. The record suggests that customers would give vouchers to drivers in exchange for transportation, the drivers would later submit the vouchers to GCTS, GCTS would reimburse the drivers, and then GCTS would bill the entities for the services.

customers who contacted him via cell phone or pager. According to Dawkins, he had eight or nine "regular customer[s]." Dawkins testified that he was limited to picking up customers within the City of Biloxi. But GCTS suggested that Dawkins could drive anywhere in the tri-county area.

¶22. It was established that either party could cancel the Agreement. According to the Agreement, during the first term, the parties could cancel by mutual agreement, by GCTS only upon a breach of the agreement, or by Dawkins upon thirty days' written notice. After the initial term, GCTS had the right to terminate the Agreement without cause upon thirty days' written notice. The Agreement further provided that GCTS could cancel the Agreement at any time if Dawkins presented an unreasonable risk of harm.

¶23. The general manager at GCTS handled any customer complaints. If GCTS determined a refund was in order, then the driver would be required to provide a refund to the customer. Additionally, GCTS had an additional right to suspend drivers until such time as GCTS either reinstated the driver or terminated the parties' agreement.[3]

¶24. Finally, Dawkins received a tax form 1099-K, which showed what he had received from credit card transactions. GCTS seemingly had the ability to keep records of Dawkins' voucher fares but did not report the information. Additionally, according to GCTS, it did not make contributions toward medical insurance, carry workers' compensation insurance, or withhold Social Security or income tax, and Dawkins was not eligible for bonuses, pensions, sick pay, or vacation pay.

---

[3] Lease payments were not required during a driver's suspension.

9

¶25. In reaching its determination that Dawkins constituted an employee of GCTS, the ALJ considered the following facts: Dawkins was subject to random drug testing; he was subject to disciplinary action if he did anything to harm the goodwill of the company; GCTS provided equipment, maintenance, and liability insurance; GCTS had rights to color scheme and advertisements; and Dawkins turned in his taxicab when he went on vacation. Evidence in the record fails, however, to show that GCTS "possessed the right to control, or controlled, the actual work of [providing transportation services to customers]." *College Network*, 114 So. 3d at 745 (¶15).

¶26. As discussed, Dawkins was not supervised while he was working. He was not required to work certain hours, nor was he required to accept a certain number of customers. GCTS did not pay Dawkins a salary or hourly fee. Instead, Dawkins was compensated through his customers. Dawkins was not required to give a percentage of his fares or report his income to GCTS. Dawkins could seemingly pick up customers anywhere in the tri-county area, and he could solicit fares with business cards and accept "walk-ins" and customers who contacted him via cell phone or pager. While the use of GCTS's dispatching service was the most successful means to obtain customers, use of the service was completely optional. Additionally, even if Dawkins used the dispatching service, he was not required to accept fares. At the hearing, it was acknowledged that Dawkins could act in the manner in which he wanted as long as he was courteous to customers, and he could not harm the goodwill of the company. The law, when considering the totality of the economic relationship displayed by the evidence in this case, establishes that Dawkins was an

independent contractor.

¶27. Under our standard of review, we cannot say that the agency's decision was supported by substantial evidence. There was very little evidence that suggested Dawkins was an employee of the company. Instead, the evidence shows that Dawkins's employment status constituted that of an independent contractor. Because the agency's decision was not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious. Therefore, we reverse and render.

¶28. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**